2024 IL App (2d) 220376-U
No. 2-22-0376
Order filed July 29, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-595 |
| ANDRES RAMIREZ, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant failed to show that the State's failure to preserve potentially useful video evidence was the result of bad faith as necessary to establish a due process violation; State's failure to preserve videos taken by police dash cameras was a discovery violation and trial court's remedy for that violation was not an abuse of discretion; and jury's determination that defendant caused in excess of $500 in damages was adequately supported by estimate from home-improvement store.

¶ 2                                    I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of Kane County, defendant, Andres Ramirez, was convicted of armed violence and aggravated discharge of a firearm. He was sentenced to concurrent terms of imprisonment of 55 years and 25 years respectively. Defendant was also

convicted of unlawful possession of a weapon by a felon. He now appeals, alleging two errors. First, defendant asserts that the State's failure to preserve several video recordings taken at the crime scene by cameras on police vehicles (dash cam videos) despite his two discovery requests seeking such material either violated his due process rights or their discovery obligations. Second, he argues that the State failed to prove beyond a reasonable doubt that he caused in excess of $500 worth of damage to property, as required to support his armed-violence conviction. For the reasons that follow, we affirm.

¶ 4                                 II. BACKGROUND

¶ 5     Defendant's convictions arise out of an incident that occurred on March 19, 2020, at about 7:30 p.m. The Aurora Police Department received multiple reports of gunshots being fired in a residential neighborhood. Officer Ryan Zuniga and others responded. As he approached the intersection of Columbia and Jefferson Streets, Zuniga heard gunshots and observed a man standing in front of the residence at 250 Jefferson Street. The man was holding something in his hand that projected a green laser in Zuniga's direction. Defendant was arrested at the scene.

¶ 6     On April 13, 2020, appointed counsel for defendant filed a motion for discovery. It requested, *inter alia*:

> "Any and all in-squad, police station and police video and audio recordings of the Defendant, or of the police or of any witness to any events involving or relating to defendant occurring on or about the date of his arrest, in a non-proprietary format which is capable of viewing in a DVD, CD or VHS player."

The motion also requested the State to secure such evidence in the possession of other government personnel. Defendant subsequently hired private counsel, who filed a similar second request on April 27, 2020.

-2-

¶ 7                              A. The Pre-Trial Motions

¶ 8     Relevant to video evidence, defendant filed two pre-trial motions. The first was entitled Motion In Limine to Exclude Edited Video and Bar Officer Testimony (motion *in limine*). The motion *in limine* sought to bar the admission into evidence of (1) a 19-second clip taken from 25 minutes of dash cam video recorded by Officer Cory McCue and (2) officer testimony regarding the contents of that video. The motion *in limine* explained that, despite a discovery request, the full 25-minute McCue dash cam video was purged. The second filing was a motion to dismiss. It argued that the charges against defendant should be dismissed because, despite two prior defense requests for discovery and preservation of squad car videos, the full 25-minute McCue video was purged and only the 19 second clip was tendered in discovery (the motion to dismiss was also based on the loss of the sweatpants defendant was wearing when arrested). The motion to dismiss alleged a due process violation.

¶ 9     An evidentiary hearing was held on defendant's motions, at which two Aurora police officers testified. First, Officer Zuniga testified that on March 19, 2020, he responded to a call of shots fired. As he approached the scene, a heavy-set male, who was in front of 250 Jefferson and wearing a "black hooded sweatshirt and light colored pants," shot at him. Then, the shooter turned towards the front stairs and front door of 250 Jefferson. Zuniga turned the corner southbound on Jefferson in his squad car and drove down the block but then reversed direction and re-approached the scene from the south.

¶ 10    Other officers arrived. At that time, using a spotlight, Zuniga saw the same person exiting the house at 250 Jefferson from a side door and run west. He and other officers gave chase on foot and arrested defendant in the backyard of 250 Jefferson. Zuniga identified defendant as the shooter, though he did not know defendant's name at that time. Zuniga explained that he identified

defendant based on his "body structure and clothing." On cross-examination by the State, Zuniga testified that he did not actually see the shooter enter the house at 250 Jefferson Street, though he saw the shooter approach the front door and then later exit that residence from the side door. The dash cam footage from Zuniga's squad car was downloaded into evidence. Defendant was arrested about two minutes after the shots were fired at Zuniga.

¶ 11    Defendant then called Sergeant Jason Cudebec of the Aurora Police Department. Cudebec testified that it is the policy of the Aurora Police Department to purge dash cam videos 90 days after they are recorded. To preserve a video, it has to be downloaded into evidence. Cudebec continued, Aurora Police Department "policy states that if the video is of evidentiary quality or, you know, germane to the case, then it is to be downloaded." On June 16, 2020, he reviewed recordings as he prepared for a hearing. The video was apparently hosted on WatchGuard, which, he said, is a "website that we can log into." At that time, the entire 25-minute McCue video still existed. Like McCue's squad video, the video of Officer Contreras, who made the arrest, was never downloaded and was similarly purged after 90 days. Cudabec was not aware that defendant had filed requests that "all squad videos from March 19, 2020, be preserved."

¶ 12    On cross-examination by the State, Cudebec stated that a patrol officer is not required to "download every video of every arrest and every scene they respond to." They only do so "if it captures the crime." Cudebec testified that McCue's van did not arrive until after the shooting was over. Moreover, McCue's camera was pointing westbound on Columbia Street and the arrest of defendant was not captured on that video. McCue's arrival on scene was captured on the dash cam video from Zuniga's squad car, which was downloaded into evidence. Cudebec agreed that "no one made efforts" to destroy any of the videos; rather, they were purged automatically after 90 days. Further, surveillance video recordings recovered from Brady Elementary School across the

street captured the entire incident, before, during, and after the shooting including the arrival of Zuniga, the movements of the shooter, and the arrivals of McCue, Officer Brian, and Officer Contreras in their vehicles. On redirect-examination by defense counsel, Cudebec acknowledged that "many videos" were tendered through discovery in their unabridged formats while only the McCue video was edited down. When asked whether it was an "important video," Cudebec stated it did not "capture the crime" but agreed that it was referenced in grand jury proceedings.

¶ 13 In counsel's argument to the trial court on the motions, he contended there was bad faith on the part of the Aurora Police Department in that Cudabec had ample time before the purge date to preserve the entire McCue video, but only preserved 19 seconds. He pointed out that "this was the only *** squad car video that was purged***. The other squad videos were tendered in their entirety by the State***." In response to the defense argument, the State pointed out that much of the relevant events were captured on other video that was tendered, including the school video, while admitting that "Officer McCue's [recording], sure, he maybe should have put it in and downloaded it, but he didn't." Also the State commented that, in addition to Zuniga's and McCue's, none of the videos of the other officers who responded to the scene were downloaded. "We can't download each and every one ***. We can't go out and search to find out which cars all arrived on that scene and get their videos ***. That is an undue burden that you cannot place on the State***."

¶ 14 In rebuttal, defendant's attorney responded:

"There were a few things mentioned. 30 to 40 videos that we didn't get? I mean, come on. That even supports my argument even more. We're not getting evidence. And you—so this video in particular *** was used in the Grand Jury testimony[,] *** it's super important, and they're trying to use it in *** the trial. *** [T]his is not a small thing. This is a big

thing. Both of these pieces of evidence [the motion also concerned the missing sweatpants] are huge pieces of evidence, either that could support the State or support our case. But we don't have them, and because of that, my client's due process rights have been violated."

¶ 15　Regarding the dash cam video, the trial court denied defendant's motion to dismiss, explaining that there was no due process violation regarding the 19-second clip derived from the McCue video, as there was other evidence to show what happened. It did, however, grant in part defendant's motion to exclude the McCue video, noting that defendant had made discovery requests with which the State did not comply, stating, "Well, when they don't do what they're supposed to do, then there are consequences." Therefore, the trial judge barred use of and testimony about the 19-second clip, but it did not bar the officers from testifying to what they personally saw at the crime scene.

¶ 16　　　　　　　　　　　　　　B. The Trial

¶ 17　The case proceeded to trial, at which Officer Zuniga was the first witness for the State. On March 19, 2020, he was on duty at about 7:25 p.m. when he received a dispatch regarding shots being fired. He and Officer Nardone, who was operating another squad car, responded. Zuniga was initially following her, and then they spread out to canvass the area. As he approached the intersection of Jefferson and Columbia, he heard gunshots. He observed "a male wearing a black-hooded sweatshirt and light-colored pants standing in front of 250 Jefferson." The individual was approximately 10 feet from the steps to the house. The individual walked toward the intersection and was holding something in his hand that was projecting a green laser toward Zuniga. Zuniga testified that based on his training and experience, the laser appeared to be the type that was sometimes mounted on a firearm. Zuniga turned to the south and reported what had occurred to dispatch. After he turned, he looked over his shoulder and saw the individual "run up the steps to

250 Jefferson and approach the front door."

¶ 18    Zuniga turned around and proceeded back to the intersection of Columbia and Jefferson. Other officers had already arrived. He then "observed the same individual that [he] saw standing out in front of the house exit the house and continue running westbound along the side of the house." The shooter exited the house from a different door (facing Columbia Street) than the one through which he had entered (facing Jefferson Street). Other officers converged on defendant. Zuniga exited his car. When he got to the rear of the house, the other officers had already apprehended defendant. Zuniga stated he could tell that defendant was the individual that had previously fired at him from in front of the house, as defendant was wearing the same clothing as the suspect he had observed earlier and had the "same type of body structure." Zuniga then made an in-court identification of defendant as the shooter. After defendant was taken into custody, Zuniga participated in a "sweep" of the residence at 250 Jefferson.

¶ 19    On cross-examination, Zuniga agreed that it was night when this incident occurred. The area was illuminated by streetlights and the headlights of Zuniga's car. He acknowledged that he was scared when defendant was pointing a gun at him. Zuniga could see only that defendant was wearing a dark-colored hoodie and light-colored pants. Zuniga concluded that the person apprehended in the back yard was the shooter based on "him being a male, having the exact clothing, body structure, and being heavier set." He acknowledged that he could not see the shooter's facial features during the shooting; however, he later added that the shooter's "facial structure" aided him in identifying defendant as the shooter. At the time of the shooting, Zuniga did not see anyone in the driveway of the residence or in the street ahead of him on Columbia. After viewing his dash cam video, Zuniga agreed that there was another person standing in the street, though he did not notice him at the time of the shooting. To Zuniga's knowledge, this person

was never questioned. However, since this person was visible in the video at the same time that the shooter was shooting, this individual could not have been the shooter. About 45 seconds to a minute after the shooting, defendant "is seen on the side of the house," "[e]xiting the house." There were five people in the residence, four adults and a child.

¶ 20     On redirect-examination, Zuniga stated that nothing like this had ever happened to him before. The moment he saw the green laser, his attention was focused on the shooter. He "saw [defendant] when he came outside of the house." Zuniga answered affirmatively when asked, "The person you identified in court today was the person you saw firing the gun at you in your squad car that night?"

¶ 21     The State then called Officer McCue. He was on duty on March 19, 2020, operating a transportation van. He was driving south on High Street (which parallels Jefferson a block to the west) when he heard several shots coming from the east. He heard Zuniga's radio call that someone was pointing a laser at him. McCue saw "a male running out from the south side of the house." He assisted in taking defendant into custody.

¶ 22     On cross-examination, McCue testified that as he approached the scene, he observed a gray Chevrolet Malibu driving west at a high rate of speed down Columbia Street; it turned northbound onto High Street. When asked whether he actually saw a man exit the side door of 250 Jefferson, McCue stated, "I saw him exiting the door." He added, "I saw [the door] close with him running out of it." Shortly before the shooting at issue here, there were two other dispatches of shots fired at separate locations in the area.

¶ 23     Officer David Brian then testified that he was on patrol on March 19, 2020, when the dispatch center "started giving out reports of shots being fired in a couple different locations within the city." He arrived at the scene, got out of his vehicle, and "observed an individual take off

running from the side of the house being pursued by Officer McCue." After they apprehended defendant, Zuniga identified him. Brian continued, "[Zuniga] was very definitive about it, and there was, like, no hesitation whatsoever."

¶ 24    Brian then went to the front of the house and made contact with its occupants. The house was rented by Moses Rodriguez and Lorena Galindo. Moses was wearing a white T-shirt and "dark-colored pants." No one in the house was wearing a black hooded sweatshirt and light-colored pants. When Brian went to the front door, he noted a shell casing right outside the door and others on the ground. He noted a muddy footprint just inside the door, which appeared fresh. Brian also noted a large amount of dog feces near the corner where Zuniga observed the shooter pointing the laser toward him. The police obtained a search warrant for the house at 250 Jefferson. Brian assisted in the search. They did not find a weapon with a laser.

¶ 25    On cross-examination, Brian acknowledged that he did not actually see defendant exit the house. He did see defendant "[take] off running" from "the vicinity of the door." He did not collect any of the shell casings he saw and did not know what type they were. He was later told that they were 9 mm casings. A green laser was never found. Brian agreed that the muddy footprint inside the door was not in the shape of a foot. The footprint was not compared to the shoes defendant was wearing. Brian participated in a search of the residence. He never saw a black hooded sweatshirt in the house. On redirect-examination, he testified that the footprint was fresh. They did a cursory search of the house before a warrant was procured and found no one hiding anywhere.

¶ 26    The State then called Investigator Joseph Salinas of the Aurora Police Department. At the time of the incident, he was on patrol with Investigator Andy Martin. They responded to the shooting. There were a lot of police in the area, and defendant was in custody. He stayed with defendant while the officers who had arrived earlier searched the area. Defendant was wearing "a

black hoodie, some dark gray boxer shorts, and some light gray pants." On cross-examination, Salinas clarified that defendant's pants were sweatpants.

¶ 27    The State also presented the testimony of Michael Ortinau, an Aurora police officer. He responded to the crime scene. Ortinau performed a gunshot residue (GSR) test on defendant that evening.

¶ 28    Matthew Rodriguez testified that he lived at 250 Jefferson Street in March 2020 and was there on the night of the shooting. Other occupants of the home included his aunt, Laura Magdalindo, his uncle, Moses Rodriguez, his brother, and a baby. Prior to the police arriving that evening, he heard gunshots outside the house. Moses told him to "get down on the ground." Matthew got "behind the dining room table." There was knocking on the front door. He heard the front door open and stated that someone, whom he was 50% to 60% sure was wearing a gray hoodie and blue jeans, entered and fell on the couch. He did not know who opened the door or who entered the house, as his head was down, but he believed the person was a man. He heard Moses say, "Get out of my house" and saw him push the individual out through the side door facing Columbia Street. Immediately after the individual was ejected from the house, the police arrived. Matthew reported never seeing a gun. On cross-examination, Matthew stated he does not know defendant and does not remember ever seeing him at his home.

¶ 29    Enrique Sosa then told the jury that he lives at 609 Columbia with his nephew, Hector Rivera. At approximately 7:30 p.m., he heard five or six gunshots while he was in his bedroom and dropped to the floor. He did not notice any damage to the front door until the next morning when he saw a metal object (presumed to be a bullet) on the floor and marks on the inner and outer (screen) doors. Rivera called the police and gave them the object.

¶ 30    Hector Rivera stated that he lives at 611 Columbia, a duplex attached to 609 Columbia where his uncle, Enrique Sosa, resides. Hector was inside his home eating when he heard the gunshots, which he described as more than one but was uncertain as to the total number. He authenticated photographs of the duplex, the damage to the doors, the presumed bullet, and an estimate from Menards. He confirmed that both the screen door and the inner wooden door at 609 Columbia were damaged by what appeared to be a bullet and that neither he nor Sosa noticed the damage until the following day. He received an estimate for the cost of replacement or repair of one door, which he gave to the police. The estimate exceeded $500.

¶ 31    Enrique Morales testified that he lives at the corner house at 521 Columbia and was sitting in his living room when he heard several gunshots. He heard the first set of gunshots and peered through the sheer curtains covering his porch window, only to see an unknown individual near the stop sign at the intersection raising his hand. Morales then heard more gunshots. Subsequently, Morales saw the individual standing near the side door of 250 Jefferson Street.

¶ 32    The State then called Kevin Gillespie, a forensic scientist with the Illinois State Police. The trial court recognized Gillespie as an expert in the fields of trace chemistry and microscopy over defendant's objection. A sample from defendant's right hand tested positive for gunshot residue. He also tested a kit performed on Moses, and Moses's right hand was also positive for GSR. This indicated that they were in the area of a firearm when it discharged.

¶ 33    Officer Joseph Coronado, an evidence technician, testified that he participated in a search of the residence at 250 Jefferson Street. He photographed defendant's shoes, which appeared to have mud and dog feces on them. On cross-examination, Coronado identified a photograph he took of a black hoodie found inside the house at 250 Jefferson Street. On redirect-examination,

Coronado stated that he did not know where in the house the black hoodie he photographed was found.

¶ 34     Following Coronado's testimony, the State rested. Defendant did not call any witnesses. The jury found defendant guilty of armed violence and aggravated discharge of a firearm, as well as one count of unlawful use of a weapon by a felon, which was found to merge into the aggravated discharge count. Defendant was sentenced to 55 years on the armed violence conviction and 25 years for aggravated discharge, to be served concurrently. Defendant now appeals.

¶ 35                                   III. ANALYSIS

¶ 36     On appeal, defendant raises two primary issues. First, he complains that the State failed to preserve numerous dash cam videos despite his two discovery requests. Second, he contends that the State failed to prove that he caused more than $500 in damages, a necessary predicate to his armed violence conviction. We affirm.

¶ 37                         A. Preservation of the Dash Cam Videos

¶ 38     Defendant first asserts that the State should have preserved dash cam videos recorded by the numerous police vehicles that responded to the shooting. Here, defendant was taken into custody on March 19, 2020. On April 13, 2020, and April 27, 2020, defendant, by counsel, filed discovery requests in which he sought, *inter alia*, "Any and all in-squad, police station and police video and audio recordings of the Defendant, or of the police or of any witness to any events involving or relating to defendant occurring on or about the date of his arrest." Defendant requested that the State use "diligent, good faith efforts to secure" discoverable material "in the possession or control of other governmental personnel." Despite these requests, the State preserved only a 19-second clip from McCue's squad car and the video from Zuniga's car (we note that the police also obtained security video from a school across the street from the shooting and from a nearby

residence). The remainder of the dash cam videos were purged in accordance with police policy on June 27, 2020 (90 days after they were made).

¶ 39    On appeal, defendant alleges that this violated both his due process rights and the discovery rules. Defendant argues his due process rights were violated under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), because it can be inferred that the missing video evidence was exculpatory. He also maintains that if the missing evidence was not exculpatory, then it was it was potentially useful and, because of the State's bad faith, its loss can be recognized as a due process injury under *Arizona v. Youngblood*, 488 U.S. 51 (1988). Finally, he asserts that the discovery violation was inadequately redressed by the trial court's ruling. We will discuss each of these three arguments in turn. A decision to deny a motion to dismiss for an alleged due process violation resulting from a failure to preserve evidence is reviewed *de novo. People v. Moore*, 2016 IL App (1st) 133814, ¶ 23. We review a trial court's decision to impose a discovery sanction for an abuse of discretion. *People v. Shlott*, 2015 IL App (3d) 130725, ¶ 24.

¶ 40                                    1. Defendant's *Brady* Argument

¶ 41    In *Brady*, 373 U.S. at 87, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Sanchez*, 169 Ill.2d 472, 486 (1996) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). In sum, in order to succeed in a *Brady* claim, "the defendant must show that: (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence was either wilfully or inadvertently suppressed by the State; and (3) prejudice ensued to the defendant."

*People v. Burt*, 205 Ill. 2d 28, 47 (2001).

¶ 42    Defendant has made no such showing here. Defendant argues the missing videos "*could have* captured the fleeing shooter." (Emphasis added.) Later, he contends, "[I]t is impossible to speculate what would have been available to the defense had it had these videos." Assertions like these do not establish that the videos *were* exculpatory, only that they *may have been* exculpatory. We acknowledge the difficulty created for the defense by the fact that the videos are not available to view.  But that does not change the analysis. Indeed, our supreme court has explained, "The *Brady* analysis is ill-suited for situations where evidence has been lost or destroyed and its contents are unknown." *People v. Hobley*, 159 Ill. 2d 272, 307 (1994).

¶ 43    Further, we must decline defendant's invitation to presume that the purged videos contained exculpatory evidence based on the State's possession and control of them, citing *People v. Carballido*, 2015 IL App (2d) 140760, ¶ 71. *Carballido* concerned an initial postconviction petition decided by the trial court at the third stage. The court reversed based upon numerous trial errors, including the failure to disclose field notes of a detective who testified.  It is true that when a party fails to turn over evidence in its control, courts have sometimes allowed the presumption that the evidence is favorable to the other party. See, *e.g.*, *Carballido*, 2015 IL App (2d) 140760, ¶ 71 (citing *People v. Nichols*, 63 Ill. 2d 443, 447-48 (1976)) (presuming in light of all of the circumstances that lost evidence was favorable to the defense and suppressed by the State, where, in the presence of other errors, it was clear that a shoe found at the point of entry of a burglary was material to the defense of alibi); *cf. People v. Danielly*, 274 Ill. App. 3d 358, 367-68 (1995) (reversing on grounds unrelated to missing evidence, court addressed non-IPI "missing evidence" jury instruction tendered by defense, which required *a presumption* against the State, and held that tendered instruction was properly refused because missing evidence not peculiarly in State's power

to produce: but on retrial allowed a non-IPI instruction allowing *an inference* against the State). But we think these cases reflect their particular facts.

¶ 44    In this context, the application of the presumption would transmute all failures to disclose evidence into potential *Brady* violations, even though *Brady* requires a showing that the evidence at issue is favorable. *Burt*, 205 Ill. 2d at 47 (holding *Brady* claim requires (1) missing evidence favorable to defendant; (2) wilfull or inadvertent suppression by State; and (3) prejudice). Allowing this presumption to substitute for the required showing would effectively eliminate this element of the *Brady* inquiry. The remaining two factors, that the State intentionally or inadvertently suppressed the evidence and that the defendant suffered prejudice, would provide no meaningful limitation. The former would be present whenever evidence is not turned over, and the latter would likely be satisfied by the presumption. As a result, application of the presumption advocated by defendant would swallow the *Brady* rule.

¶ 45    We also find unpersuasive defendant's assertions that a second unidentified person seen in the video "lurking in the shadows next to 250 Jefferson Street immediately after the shooting" could have provided what defendant terms an "alternative suspect," rendering the videos exculpatory. First, we note that defendant is making this argument based on video from the school across the street, so this evidence was in the record and the argument available to defendant. Second, it is speculative as to whether additional video would have confirmed that this was in fact an alternative suspect or exonerated this person. Defendant concedes this second point when he writes, "Had the quality been better on the Brady School surveillance video, perhaps this individual could have been ruled out as a suspect." Indeed, it appears this individual was next to the house at the time the shooter was firing toward Zuniga, as a light goes on inside a parked vehicle in the area where this individual is seen while the shooter is still visible in front of the house. The presence of

this individual notwithstanding, we face a situation where the evidence that was not provided to defendant was potentially useful to him rather than exculpatory. This is not a *Brady* violation.

¶ 46                    2. Defendant's *Youngblood* Argument

¶ 47    We now turn to defendant's claim of a due process violation under *Arizona v. Youngblood*, 488 U.S. 51 (1988), which also considered "the area of constitutionally guaranteed access to evidence." *Youngblood*, 488 U.S. at 56. In *Youngblood*, a defendant charged with sex crimes argued that he suffered a due process violation under *Brady* where the State failed to preserve semen samples found on the victim's clothing. But the Court characterized the missing evidence as only "potentially useful" and held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. *Youngblood* refused to impose upon the police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. The Court purposefully limited the availability of a due process argument "to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.

¶ 48    To establish bad faith, "a defendant must prove 'official animus' or 'a conscious effort to suppress exculpatory evidence.' " *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). "Bad faith implies a furtive design, dishonesty or ill will." (Internal quotations omitted.) *People v. Sandridge*, 2020 IL App (1st) 173158, ¶ 22, 24-25 (finding bad faith and remanding for new hearing and new trial, where police "*deliberately*" destroyed investigation field notes right after defendant in murder case subpoenaed

the notes, and where officer testimony offered no excuse and "defie[d] belief and strain[ed] credulity" (emphasis in original)); *People v. Nunn*, 2014 IL App (3d) 120614, ¶ 17 (finding bad faith and a due process violation where police ordered civilian witnesses to the arrest of defendant to delete their video recordings, despite police knowledge that the citizens had the right to record the arrest).

¶ 49    *Danielly*, 274 Ill. App. 3d at 364, applied the dictionary definition of bad faith and found none where the police returned clothing to the victim of a rape, along with the victim's purse and checkbook, when she appeared at the station and requested the belongings she left at the scene of the attack from which she had run naked and screaming two days earlier. *Danielly* stated:

> " 'Bad faith' is defined by Black's Law Dictionary as 'generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty * * *, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.' The term is distinguished from bad judgment or negligence in that bad faith implies a furtive design, dishonesty or ill will. (Black's Law Dictionary 139 (6th ed.1990).)."

On these facts, the court found "no evidence that the police acted with a 'sinister motive' or 'ill will' in returning the victim's underwear to her***." *Id.*

¶ 50    Mere negligence is insufficient to establish bad faith. See *Youngblood*, 488 U.S. at 58 (holding failure of police to preserve and test biological evidence from victim was negligent "at worst," noting nothing was concealed from defense); see also *People v. Ward*, 154 Ill. 2d 272, 298-99 (1992) (finding no due process violation where police failure to preserve and test alleged brain matter observed adhering to the defendant's clothing was "at worst" negligent and insufficient to demonstrate bad faith); *People v. Sutherland*, 223 Ill. 2d 187, 193-94 (2006)

(concluding no bad faith or due process violation where—sometime during the 14 years after the car was seized until the defendant's retrial and request for the vehicle—police lost track of the defendant's car from which evidence of murder was retrieved). And courts have disparaged mere technical violations: "[A] defendant should not be rewarded for the inadvertent loss of a piece of evidence where other evidence sufficient to support the conviction remains." *Hobley*, 159 Ill. 2d at 307. The bottom line is that, to prevail here, defendant must demonstrate bad faith on the part of the State.[1]

¶ 51     To show bad faith here, defendant points to two things. First, he notes that he requested the preservation of the videos via a discovery request. Second, he criticizes the policies of the Aurora Police Department and of the State's Attorney's Office regarding the retention of dash cam videos.

¶ 52     Regarding defendant's first point, the mere fact that defendant made a discovery request that the State failed to comply with is insufficient in itself to establish bad faith. If any nondisclosure following a request established bad faith, all discovery violations would be due process violations under *Youngblood* as well. We acknowledge that in *People v. Newberry*, 166 Ill. 2d 310, 317 (1995), our supreme court stated, "Where evidence is requested by the defense in a discovery motion, the State is on notice that the evidence must be preserved, and the defense is not required to make an independent showing that the evidence has exculpatory value in order to

---

[1]*Brady*, *Youngblood*, and the cases discussing this rule use "prosecution," "State," "government," and "police" interchangeably and appear to assume the required bad faith could emanate from any of those actors. See, *e.g.*, *Brady*, 373 U.S. at 87 ("the prosecution"); *Youngblood*, 488 U.S. at 58 ("the police"), 488 U.S. at 57 ("the State"), and 488 U.S. at 57 ("the Government"); *Hobley*, 159 Ill. 2d at 307 ("the State").

establish a due process violation." However, subsequently, in *Illinois v. Fisher*, 540 U.S. 544, 548 (2004), the United States Supreme Court stated, "We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police." Since then, a number of Illinois courts—including this one—have determined that the Illinois Supreme Court would follow *Fisher* if presented with the question. *People v. Kizer,* 365 Ill. App. 3d 949, 960-61 (2006) (predicting supreme court would follow *Fisher* and require bad faith where blood alcohol samples destroyed per normal policy despite discovery request; no due process violation found); *People v. Voltaire*, 406 Ill. App. 3d 179 (2010) (collecting cases, predicting *Fisher* analysis would prevail, and holding no bad faith where, in spite of discovery request, controlled substance destroyed after conclusion of case against co-defendant); *People v. Stolberg*, 2014 IL App (2d) 130963, ¶ 28 (noting *Fisher* requires a showing of bad faith and finding none where body of homicide victim inadvertently cremated after discovery request). Like these cases, we hold that, despite his discovery request, defendant still must show bad faith to establish a due process violation.

¶ 53    Defendant asserts that bad faith can be attributed to the State based on the policies of the prosecutors and police regarding the retention of dash cam videos. Defendant first complains of the policy of the Aurora police whereby videos are automatically destroyed after 90 days (by the information management system that maintains them) unless a police officer downloads a video thereby placing it into evidence. Second, he points to the State's Attorney's Office's reliance on police officers to determine which videos are downloaded into evidence and hence preserved.

¶ 54    We first note that the Aurora police policy whereby the dash cam videos are purged after 90 days does not establish bad faith on the part of the police or the State. As the Supreme Court has stated, the police do not have "an undifferentiated and absolute duty to retain and to preserve

all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. Moreover, the Court has held that the destruction of evidence by police in good faith and in accordance with their normal practice is not a due process violation. *Fisher*, 540 U.S. at 548 (reversing Illinois appellate court, which ruled that discovery request for missing evidence obviated bad faith requirement and dismissed case on "due process" grounds where missing evidence was "outcome determinative").

¶ 55    In considering whether the loss of evidence results from normal police practice *Fisher* cited *Trombetta*, 467 U.S. at 482. There, the Supreme Court examined whether the destruction of breath samples in a drunk driving prosecution constituted a due process violation. It determined that it did not, because:

> "To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for respondents, the officers here were acting 'in good faith and in accord with their normal practice.' *Killian v. United States*, 368 U.S. 231, 242 (1961). The record contains no indication of official animus towards respondents or of a conscious effort to suppress exculpatory evidence."

¶ 56    The same is true here. The police were not aware of defendant's discovery requests. It is undisputed that the videos were purged from the storage system pursuant to "normal practice," (*Killian*, 368 U.S. at 242), an existing policy that had nothing to do with defendant's case. This does not amount to bad faith or animus toward defendant. See *People v. Cunningham*, 2018 IL App (1st) 153367, ¶ 47 ("Thus, we cannot say that the destruction of the jacket was not in accordance with normal police procedures."); *United States v. Bloodworth*, 412 Fed. Appx. 639, 640 (2011) ("Our review of the record leads us to conclude that even if the recording of [the

d]efendant's traffic stop was potentially useful, the failure to preserve it was not motivated by bad faith. Instead, the record reveals that the recording was deleted automatically from the police department's software system, which purges older recordings when the system reaches its maximum capacity."). Indeed, it was just as likely that inculpatory material would be purged as exculpatory. Neither the routine purge by the police nor the department's neutral policy establishes a due process violation.

¶ 57    Defendant's also mentions for the first time in his reply brief that bad faith should not be required because an Illinois statute requires police to retain in-car video "made as part of an arrest or [where] the recordings are deemed evidence" until final disposition of the case and a court order allowing destruction. 720 ILCS 5/14-3(h-15) (West 2020). Arguments may not be raised for the first time in a reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Thus, defendant has forfeited this argument. *Alms v. Peoria County Election Comm'n*, 2022 IL App (4th) 220976, ¶ 31. Forfeiture aside, we do not think that the statute obviates the requirement of a bad faith finding to establish a due process violation. *Cf. People v. Wachholtz*, 2013 IL App (4th) 110486, ¶ 31 (determining that a violation of the statute does not require suppression).

¶ 58    But this does not end our due process analysis. Defendant also argues that this court should "impute bad faith on the State" for its inaction after his discovery requests. During final argument on the due process motion related to the loss of the original 25-minute-long version of the McCue video (of which only 19 seconds was preserved and then only due to the fortuitous work of Sgt. Cudabec), the State commented that only Zuniga's dash cam videos had been preserved: "That's the video we have, *** he's the one who captured the shooting and that video was downloaded. *** Officer McCue's [recording], sure, he maybe should have put it in and downloaded it, but he didn't. And again, it wasn't a case where it was downloaded and then we destroyed it or did not

tender it and now it's gone. It was never in evidence to be tendered. It was never downloaded. \*\*\* And again, the other 20 officers that came, there are no videos of that. We can't download each and every one, and when they make a blanket request that we have to preserve any and all videos, again, Judge, that only goes to the ones that are downloaded. We can't go out and search to find out which cars all arrived on that scene and get their videos and try and make sure they download them. That is an undue burden that you cannot place on the State\*\*\*."

¶ 59    Defendant argues that the State's policy to rely upon the police to decide which videos should be preserved is "in direct conflict with all directives regarding a prosecutor's [discovery] responsibilities." We agree that the State has a duty to oversee the discovery process and review potential evidence in the possession of the police. Illinois Supreme Court Rule 412(f) (eff. March 1, 2001) recognizes this duty: "The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Similarly, Illinois Supreme Court Rule 412(g) (eff. March 1, 2001) provides:

> "Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good-faith efforts to cause such material to be made available to defense counsel \*\*\*."

¶ 60    Our supreme court has carefully explained the effect of a discovery request on the duties of the prosecutor and the court's words bear repeating here. In *People v. Kladis*, 2011 IL 110920, the defendant was arrested for driving under the influence of alcohol and requested the arresting officer's dash cam video, which was routinely purged *after the request*. The trial court barred the State from "introducing testimony relating to what was contained on the tape." *Id.* ¶ 9. The supreme

court summarized the trial court's ruling:

"The [trial] court found that the 'Notice to Produce' which accompanied defendant's petition to rescind her statutory summary suspension placed the State on clear notice that she wished to have a copy of the video recording at the first court date—a fact which the State did not dispute. The State, however, did nothing in response. The court observed that the State 'could have called the police department and got the tape prior to the time that it ran out' or it 'could have filed an answer * * * stating it's not our obligation [to produce the tape] yet because we don't deem this to be a discovery motion * * * [because it includes] things requested in here that we don't have to supply to you.'

Noting that this was 'the third case I have had like this in three weeks' where a defendant asked the State to preserve a video recording and it was destroyed, the [trial] court found the recording of defendant's traffic stop to be 'an important piece of evidence' and held that imposition of a sanction against the State for its destruction was proper." *Id.* ¶¶ 8-9.

¶ 61 The State appealed, and our supreme court held, "[U]pon receiving the written Rule 237 notice to produce the video recording five days after [the] defendant was arrested—and 25 days before it was destroyed—the State was placed on notice and should have taken appropriate steps to ensure that it was preserved." *Id.* ¶ 38. It then affirmed the trial court's determination that the State's omission constituted a discovery violation (*id.* ¶ 39) and the discovery sanction that it chose (*id.* ¶ 46).

¶ 62 In a similar vein, the United States Supreme Court, considering a potential *Brady* violation, addressed the pivotal role of the prosecutor in the discovery process:

"But the prosecution, which alone can know what is undisclosed, must be assigned

-23-

the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' [that the material is favorable to the defendant] is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

¶ 63 Thus, both under the discovery rules of this state, our caselaw, and federal due process caselaw, prosecutors have a duty to oversee the discovery process, to learn of evidence available to the police, and to ensure that a criminal defendant obtains all evidentiary material to which he or she is entitled. "The State has a duty to use due diligence to ensure that it becomes aware of discoverable matter and to see that there is a proper flow of information between it and all its law enforcement agencies and personnel." *People v. Leon*, 306 Ill. App. 3d 707, 715 (1999) (affirming trial court's denial of State's motion for leave to file additional discovery just prior to trial where State failed to obtain numerous reports withheld by police agency); see also Illinois Rule of Professional Conduct 3.8(d) (eff. Jan. 1, 2016) ("The prosecutor in a criminal case shall *** make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense."). It is clear that when the State in this case received a discovery request from the defense, "the State was placed on notice and should have taken appropriate steps to ensure that [the requested material] *** was preserved." *Kladis*, 2011 IL 110920, ¶ 38. It is also clear that these responsibilities cannot be delegated by the prosecutor to any other agency.

¶ 64 But the issue here is whether the State's failure to fulfill this duty amounted to bad faith such that a due process violation has occurred. *Kladis* makes clear that the diligence required of a prosecutor would certainly include communicating to the police that a discovery request has been

made for material that the prosecutor should have known would be routinely purged (*Kladis*, 2011 IL 110920, ¶ 38; see also *Newberry*, 166 Ill. 2d at 317 ("Where evidence is requested by the defense in a discovery motion, the State is on notice that the evidence must be preserved ***.")). Mere negligence is insufficient to establish bad faith. *Youngblood*, 488 U.S. at 58. Though "a neglect or refusal to fulfill some duty" can establish bad faith (*Danielly*, 274 Ill. App. 3d at 364, (quoting Black's Law Dictionary 139 (6th ed.1990))), it must be prompted "by some interested or sinister motive." We acknowledge that, with an appropriate record, the failure of the prosecution to advise the police of a defense request for the preservation or production of evidence subject to a routine purge could support a finding of bad faith and a due process violation.

¶ 65    The continued dereliction of the prosecutor's duties relative to discovery and discovery requests could lead to adverse consequences for the State. In *People v. Libberton*, 346 Ill. App. 3d 912 (2003), then Presiding Justice Hutchinson, commenting upon a series of appeals revealing a pattern of improper argument by the State, observed, "In cases such as this, where prosecutorial misconduct has not been deterred through admonition or condemnation, the United States Supreme Court has stated that it 'may well so seriously undermine the integrity of judicial proceedings as to support reversal ***.' " *Id.* at 927 (Hutchinson, P.J., dissenting) (quoting *United States v. Young*, 470 U.S. 1, 33 n. 16 (1985) (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.)); see also *United States v. Ludwig*, 508 F.2d 140, 143 (10th Cir. 1974) (finding "prejudicial error" where the case did "not present an isolated incident on the subject of improper personal injection of government counsel in the course of argument"). The State would be wise to heed this warning and fulfill this duty in the future. *Cf.* Thomas P. Sullivan & Maurice Possley, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. Crim. L. & Criminology 881, 909 (2015) (arguing that the judicial role requires preventing

prosecutorial misconduct).

¶ 66    A word about *People v. Trolia*, 69 Ill. App. 3d 439, 449-50 (1979), upon which defendant

relies, may be in order. Defendant argues that *Trolia* established that the State's conduct amounts

to bad faith. In that case, the court refused to excuse the State's failure to turn over an exculpatory

statement that was in the possession of the police but unknown to the State's Attorney's Office.

The court held that the State and police had a duty to cooperate to ensure such material was

disclosed to a defendant. *Id*. But *Trolia* provides little guidance here, as it involved a specific item

of evidence known to be exculpatory, while this case concerns a large quantity of potential

evidence, the value of which is unknown. Because *Trolia* involved exculpatory material, it fell

within the scope of *Brady* (*Id.* at 448), which distinguishes it from the present case.

¶ 67              3. *Defendant's Argument Regarding the Discovery Sanction*

¶ 68    We now address defendant's final argument related to the lost dash cam videos: the

contention that the sanction imposed by the trial court in this case was insufficient. To this end, he

relies on Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 23, 2020) (discussing sanctions). The

trial court agreed that the State committed a discovery violation, and it granted defendant relief on

this basis:

> "With respect to the motion in limine to exclude edited video and bar officer
>
> testimony, I'm going to grant that in part and deny that in part. There was a discovery
>
> request made requiring that the State preserve all these videos and they did not, and the
>
> argument is perhaps they should have, but they didn't. Well, when they don't do what
>
> they're supposed to do, then there are consequences. So I'm going to bar the admission of
>
> that 19-second video clip into evidence; however—and it's uncertain what 'bar officer
>
> testimony' means—I'm not barring any officer from testifying as to what that officer saw,

  not on the video, but saw at the scene."

We review a trial court's decision to impose a discovery sanction for an abuse of discretion. *People v. Shlott*, 2015 IL App (3d) 130725, ¶ 24. An abuse of discretion occurs only if no reasonable person could agree with the trial court. *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26.

¶ 69 Defendant contends that the trial court should have ordered more significant relief, asserting that the case should be dismissed. He recognizes that dismissal is a severe sanction, but points out that it has been held appropriate for discovery violations that impair a defendant's ability to have a fair trial. See *People v. Pearson*, 210 Ill. App. 3d 1079, 1085 (1991). Defendant again argues that he was prejudiced by the State's failure to preserve all of the dash cam video recorded by the vehicles that responded to the shooting. However, defendant's claims of prejudice amount to mere speculation as to what these videos may have contained. We reject defendant's reiteration of his claims of bad faith on the part of the State in this context. Nor will we presume bad faith based on the fact defendant filed a discovery request for reasons explained above. See *Stolberg*, 2014 IL App (2d) 130963, ¶ 28.

¶ 70 Alternatively, defendant argues that the trial court's suppression order directed only to the 19-second clip taken from McCue's dash cam was too narrow. Defendant contends that since the dash cam video was excluded, McCue should not have been allowed to testify regarding the events based on his personal recollection, as the video was not available to "potentially allow defense counsel to impeach" McCue on cross-examination. Initially, we note that the 19-second clip was unavailable for impeachment because defendant moved to suppress it. In any event, while barring McCue from testifying may well have been a reasonable remedy for the trial court to grant, defendant does not explain why it is the only reasonable solution, or, more importantly, why no reasonable person could agree with the position actually adopted by the trial court. Contrary to

defendant's argument, one could conclude that barring the officers from testifying to the events they actually observed would deprive the jury of much relevant evidence and impair the truth-seeking process of the trial. *Cf. Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357, 364 (1998) (noting that application of the exclusionary rule may result in the exclusion of relevant evidence and detract from the truthfinding process). Given that defendant has failed to establish bad faith on the State's part or that the purged videos were anything more than potentially useful, a reasonable person could conclude that the remedies suggested by defendant are too harsh. In other words, defendant has not established that the remedy ordered by the trial court was an abuse of discretion. We are mindful that the correct sanction to be applied for a criminal discovery violation "is left to the trial court's discretion, and the judgment of the trial judge is given great weight." *People v. Morgan*, 112 Ill. 2d 111, 135 (1986).

¶ 71 Before closing, we deny defendant's request that we remand this case for another hearing regarding the purged videos. A pretrial hearing was already had on the subject. Defendant does not explain why this was inadequate. He cites *People v. Coleman*, 307 Ill. App. 3d 930, 936 (1999), in support of his position. In that case, this court applied *Newberry* and found a due process violation. *Id.* at 932. The defendant had filed a discovery request and the trial court found that "it would appear" that the State destroyed the evidence in question prior to the filing of the request. *Id.* This court held this factual finding was unfounded. *Id.* We therefore reversed the trial court's order denying the defendant's motion to dismiss. *Id.* at 936. Specially concurring, Justice Thomas stated that rather than dismissing based on the trial court's erroneous finding, he would remand for a hearing to determine whether the evidence was destroyed before or after the defendant filed his discovery request. *Id.* (Thomas, J., specially concurring). We first note that the majority did not agree with Justice Thomas on this point. Further, the remand he advocated was to address a

specific, narrow question of fact that the trial court had resolved erroneously. In this case, no error occurred (similar or otherwise). We do not find the *Coleman* concurrence persuasive in this context.

¶ 72   Accordingly, defendant has not established that the dash cam videos that were purged from the system where they were stored were exculpatory or that they were destroyed in bad faith. Further, the trial court's decision as to an appropriate sanction was not an abuse of discretion. We thus reject defendant's arguments on this issue.

¶ 73                            B. Sufficiency of the Evidence

¶ 74   Defendant also argues that the State failed to prove beyond a reasonable doubt that he caused more than $500 in damages to a door across the street from where he was firing. Defendant stands convicted of armed violence predicated on felony criminal damage to property valued between $500 to $10,000 "in that he damaged property of another, a house located at 609 Columbia Street." See 720 ILCS 5/33A-2(b) (West 2020) (armed violence); 720 ILCS 5/21-1 (West 2020)) (criminal damage to property). When a defendant challenges the sufficiency of the evidence, a reviewing court must construe all the evidence in the light most favorable to the prosecution and determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 19. Further, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Id*. A criminal conviction will be reversed where the evidence is so improbable, unreasonable, or unsatisfactory as to leave a reasonable doubt regarding a defendant's guilt. *Id.*

¶ 75   The amount of damages inflicted is an element of the offense of criminal damage to property (720 ILCS 5/21-1(b) (West 2020)). The cost of making repairs is generally regarded as

competent evidence of the amount of damages. *People v. Carraro*, 77 Ill. 2d 75, 80-81 (1979). An estimate of the cost of repair is sufficient to establish this amount, regardless of whether the repairs were actually undertaken. *People v. Chambers*, 2020 IL App (2d) 190041, ¶14. Moreover, the factfinder may rely upon its "common knowledge" regarding the costs of making repairs when appropriate. *People v. Roby*, 202 Ill. App. 3d 143, 146-47 (1990) ("To say that it is not common knowledge that the value of the damaged steering column and the electric locks on the windows and doors of a luxury model car are worth more than $300 is to close our eyes to reality."); *People v. Tassone*, 41 Ill. 2d 7, 12 (1968) ("To say that it is not common knowledge that a large tractor and trailer are worth more than $150 is to close our eyes to reality."). The State need not prove the exact amount of the damages, so long as it establishes that they exceed the statutory threshold. *Carraro*, 77 Ill. 2d at 79-80.

¶ 76    Defendant asserts that the evidence presented by the State as to the value of the damages he caused was insufficient to allow the State to carry its burden. To establish that defendant caused in excess of $500 in damages, the State submitted, without objection, an estimate of the cost to replace the door that Hector Rivera obtained from Menards. The State also submitted photographs of the damages, which show, as defendant concedes in his opening brief, damages to the screen door frame, the screen itself, and the front door. The estimate from Menards covered only the replacement of the front door.

¶ 77    We reject defendant's assertion that the State forfeited reliance upon any damages to the screen door by not making any argument concerning them. Evidence of damages to the screen door was presented to the jury, regardless of whether the State addressed these damages during argument, and defendant cites nothing to support the proposition that the jury could not consider it (also, we may affirm on any basis appearing in the record (*People v. Daniel*, 2013 IL App (1st)

111876, ¶ 37)). Moreover, the absence of a written estimate does not render these damages irrelevant. As noted, a jury is not required to ignore its own knowledge regarding value. *Roby*, 202 Ill. App. 3d at 146-47. Absent an estimate, a jury could nevertheless infer that the screen door had more than negligible value (recall here that we must construe the record in the light most favorable to the State (*Murray*, 2019 IL 123289, ¶ 19)).

¶ 78 More to the point is the written estimate itself, which was admitted without objection and contains the following valuations: (1) base price, $407.01; (2) sill price, $25.39; (3) custom door size price, $126.93; (4) door bore price, $5.92; (5) frame price, $93.93; (6) hinge price, $10.15; and (7) weather strip price, $13.54. This totals $682.87. We conclude that this estimate along with the other evidence presented, construed in the State's favor, was sufficient to allow the jury to reasonably infer that defendant caused in excess of $500 in damages. To the extent that the estimate did not reflect the exact door that defendant damaged, we note that it exceeded the $500 threshold by over 35 percent. In *Chambers*, 2020 IL App (2d) 190041, ¶13, this court found it significant that the estimate at issue in that case was almost 25 percent higher than the $500 mark. In this case, the margin is even greater. Moreover, that the jury could infer that the screen door had some value increases this margin further.

¶ 79 Defendant raises a number of issues regarding the sufficiency of the proofs. First, he questions the qualifications of the person who generated the estimate. Second, he notes only one page of the estimate is in the record, while it indicates that it is but one of four pages. Third, he points out that the estimate is for a replacement door made of metal while the damaged door was wooden. Fourth, he observes that the estimate covers hardware while defendant damaged only the existing door and is for a "custom door size." Defendant's arguments mostly implicate the weight to which this evidence was entitled. Weight, of course, is primarily a matter for the trier of fact.

*People v. Alvarez*, 2012 IL App (1st) 092119, ¶ 51.

¶ 80    Regarding defendant's first point, Rivera testified—without objection—that he procured the estimate from Menards, so the jury could infer that it was prepared by someone in the business of pricing such things. See *Chambers*, 2020 IL App (2d) 190041, ¶ 13 ("[T]he trier of fact could reasonably conclude that an auto repair shop owner with decades of experience could make an estimate within that large a margin of error."). It is true that the portion of the estimate in evidence states that it is page two of four; however, we fail to see how this undermines the information provided on page two. It is also true that the replacement door proposed by Menards was not made of the same material as the door defendant damaged. The likelihood that Menards (or anyone else) would stock the exact same door that defendant damaged is low, so there were bound to be some differences between the damaged door and its replacement. In any event, these differences are matters of weight. *Cf.*, *In re L.M.*, 205 Ill. App. 3d 497, 512 (1990) (holding that any defects in the basis of an expert's opinion are a matter of the weight to which the opinion is entitled).

¶ 81    As for the fact that the estimate included hardware necessary to replace the door, we reiterate that the cost of the repair is an acceptable measure of damages. *People v. Grass*, 126 Ill. 2d 540, 542 (1984). We do not find it surprising that replacing an exterior door requires some incidental hardware to complete the project and is therefore part of the cost of repair. We also note that the base price of the door along with the added cost due to it being a custom size exceeds the $500 threshold, hardware notwithstanding. Finally, we attach no significance to the fact that the door defendant damaged was of a custom size, since that is the size of the door that defendant damaged and it is well established that one takes one's victims as one finds them. *People v. Patton*, 249 Ill. App. 3d 844, 850 (1993).

¶ 82    In short, construing the evidence in the light most favorable to the State, we hold that a

rational factfinder could conclude that defendant caused in excess of $500 in damages.

¶ 83                                    IV. CONCLUSION

¶ 84      In light of the foregoing, the judgment of the circuit court of Kane County is affirmed.

¶ 85      Affirmed.