THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLINTON DANIELLY, Defendant-Appellant.

First District (6th Division)   No. 1—92—0959

Opinion filed July 14, 1995.

EGAN, J., specially concurring.

Coffield, Ungaretti & Harris, of Chicago (J. Timothy Eaton and Frank Pasquesi, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Ann L. Benedek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ZWICK delivered the opinion of the court:

Defendant, Clinton Danielly, was convicted following a jury trial of aggravated criminal sexual assault. He was sentenced to a prison term of 12 years for the offense. On appeal he argues that police conduct in returning the complainant's underwear to her following the initial investigation deprived him of due process and has deprived him of ever being able to receive a fair trial. He also argues that an *ex parte* communication between the trial judge and the jury, in combination with the trial court's later decision to give a *Prim* instruction urging jury consensus, constitutes reversible error. We reverse and remand for further proceedings.

At trial, the defendant and the complainant offered dramatically different versions of the events which occurred following their date on July 21, 1990. At one time, years earlier, the defendant and the complainant had dated one another regularly and had engaged in consensual sexual relations. Although the complainant had not seen the defendant in recent years, they were reintroduced at a party and she subsequently agreed to spend July 21 with defendant at his house helping him to clean his flooded basement. Later, the couple changed their clothing at the defendant's home and went out for drinks at a local nightclub. The complainant denied having had consensual sexual relations with the defendant at any time on July 21. The defendant later stated that the two had sex that afternoon.

At the nightclub, the defendant and the complainant began to argue. The complainant testified that she told the defendant at the club that she had no interest in having sexual relations with him and that he became upset. She demanded that they return to his house so that she could recover her purse and duffel bag which contained the clothing she had worn while cleaning up the basement. After the two arrived at the house, however, she stated that the defendant went into his bedroom and returned with nothing on but his shirt. The complainant testified that the defendant grabbed her with both his hands and shoved her to the floor. As he ripped off her skirt and underpants, she was screaming for defendant to get off of her. When defendant began to choke her, she scratched his face. Defendant became more angry and threatened to kill her stating, "I'll kill you, bitch."

The complainant testified that, while defendant was on top of her, she lost consciousness for a short period of time. When she awoke, defendant had placed his arm across her chest to keep her on the floor. It was at this point that the defendant placed his penis into her vagina for approximately one minute. The complainant testified that, when she was able to finally get away from the defendant, she ran out of the house naked and bloody. All of her belongings were left in his home.

To corroborate the complainant's testimony, the State introduced the testimony of Marian Butler, who lives a short distance from the defendant's home. She testified that she was called to her front door on July 21 and found the complainant hysterical, nude and looking as though she had just been beaten. The complainant stated to her that she had just been raped and asked that her mother be called. When Mrs. Butler allowed the complainant into her home, the complainant crouched into a ball in the corner, crying and shaking. Mrs. Butler called the police. When they arrived, the complainant would only allow Mrs. Butler to speak with her for the first 15 minutes. Eventually, the complainant was able to speak with the police. One of the police officers who arrived at the scene testified that "she [the complainant] trembled and tried to back up farther into the wall but there was no place to go." She eventually told the officers that she had been raped by the defendant and showed them where he lived.

When the complainant was examined in the hospital she told the examining physician that she had been punched in the face and been forced to engage in vaginal intercourse. The doctor testified that a vaginal examination revealed reddening. She was treated with antibiotics to prevent sexually transmitted diseases and referred to counseling.

When the officers knocked on the defendant's door, they received no response and took the complainant to Little Company of Mary Hospital for treatment. She had facial scratches, a swollen left eye and was not under the influence of alcohol.

Two days after the attack, the complainant went to the police station and asked for her belongings back. She was given her checkbook and purse. She testified that she also received her ripped undergarments, one shoe and her shorts, all of which she threw in the trash.

Detective Edmond Leracz testified that he and his partner went to the defendant's home and again received no response. They then proceeded to the defendant's parents home, and the defendant's parents then accompanied the police to the defendant's house. Defendant was found inside the house after the front door was opened with a key. When asked about the complainant's belongings, defendant told the detectives that there was nothing in the house which belonged to the complainant.

Mr. Derrick Webster testified that he was cleaning his yard when he discovered the complainant's clothing in his trash. After the police were called, his neighbor, Mr. Clark, gave Mr. Webster a woman's purse which Mr. Clark had discovered earlier in the day. Mr. Web-

ster identified the complainant's purse and checkbook as the same items he had seen on July 22.

As part of the defendant's case, a police crime lab serologist testified that she examined swabbings taken from the complainant at the hospital following the attack. The serologist found no sperm. She stated that she could not conclude from the lack of sperm, however, that the complainant had not been sexually assaulted.

Defendant's sister, Denise Danielly Hill, also testified as part of defendant's case. She stated that she had spent part of July 21, 1990, with the defendant and the complainant. Ms. Hill helped clean the defendant's flooded basement that day. Hill left the house at approximately 7:30 p.m. to go to her bartending job at a local nightclub. Later, at a bar where she worked, she saw the defendant and the complainant from about 10 p.m. to 1 a.m. She observed them kissing, hugging and dancing. Just before they left the bar, it was apparent that the complainant wanted to stay and the defendant wanted to leave. Initially, defendant left by himself, but then returned and they left together.

The defendant testified that he received a call from the complainant on July 21 and she asked him if he wanted to go out that evening. He agreed and she came to the house that afternoon where they worked on the basement together, showered together and had sexual relations. The defendant stated that he used a prophylactic while they had sex in the shower. He testified that at the nightclub, he wanted to go but that the complainant wanted to stay and they argued. When they left together they continued the argument.

Defendant testified that, when they arrived at the house, he wanted to "set the right mood" and so put on soft music and they eventually ended up naked and in bed together. Everything was going smoothly until he and the complainant began another fight. Defendant testified that he and the complainant eventually began physically shoving each other and he admitted striking her in the face. He testified that he held her down on the floor while she tried to scratch and bite him. When he finally allowed her to get up, she ran out of the house naked and screaming.

The defendant stated that he was scared at this point and took the complainant's possessions down a nearby alley and threw them in a garbage can. None of the clothing was torn. Defendant admitted that he originally told police that he had put the complainant out of his car following a fight they had and that he came home alone. He lied to the police after he was arrested because he was scared.

Defendant first argues that the return of the complainant's underwear to her by police and its subsequent destruction violated

his due process rights to have access to evidence. He claims that if the underwear had been admitted into evidence, the jury would have had physical proof that the underwear had not been torn, which was consistent with his story that the complainant undressed voluntarily. Because he claims he cannot receive a fair trial without the complainant's underwear, he seeks an outright reversal of his conviction.

In *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333, the United States Supreme Court limited the State's obligation to preserve evidence by requiring the defendant to affirmatively demonstrate that the police acted in "bad faith" in losing potentially useful evidence before a due process violation can be said to exist. The Court stated that it did not want to impose "on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." The Court also stated that "requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it." (*Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337.) The Illinois Supreme Court has followed *Youngblood*, holding that a mere showing of negligence by the police in losing evidence is insufficient to create a due process violation. (*People v. Ward* (1992), 154 Ill. 2d 272, 609 N.E.2d 252.) As in *Youngblood*, the court held that the defendant must show "bad faith."[1] *Ward*, 154 Ill. 2d at 297-99.

While the State argues that the underwear was merely "an avenue of investigation which might have led [in] a number of directions," the police certainly knew the underwear could be used as evidence when it was discovered and, indeed, the State used the underwear's presence in the trash as proof of defendant's guilty

---

[1]We note parenthetically, but with interest, the growing number of opinions from other State courts which have rejected application of the *Youngblood* "bad faith" test, in favor of a more liberal approach as required by State constitutional law. (See, *e.g.*, *State v. Morales* (1995), 232 Conn. 707, 657 A.2d 585; *Commonwealth v. Henderson* (1991), 411 Mass. 309, 582 N.E.2d 496; *State v. Delisle* (1994), 162 Vt. 293, 648 A.2d 632; *Hammond v. State* (Del. 1989), 569 A.2d 81; *Ex parte Gingo* (Ala. 1992), 605 So. 2d 1237; *State v. Matafeo* (1990), 71 Haw. 183, 787 P.2d 671; *Thorne v. Department of Public Safety* (Alaska 1989), 774 P.2d 1326.) In light of the court's opinion in *Ward*, and until our supreme court holds otherwise, "bad faith" is the appropriate Illinois test.

knowledge. The State also referred to the fact that the underwear had been torn at several points during the trial. There can be no doubt that the police should have preserved this evidence.

■ Nonetheless, we cannot agree with the defendant that, in returning the complainant's property to her, the police acted in "bad faith." "Bad faith" is defined by Black's Law Dictionary as "generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty \*\*\*, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." The term is distinguished from bad judgment or negligence in that bad faith implies a furtive design, dishonesty or ill will. (Black's Law Dictionary 139 (6th ed. 1990).) "There is a plethora of Illinois decisions which affirm convictions notwithstanding the loss or destruction of evidence which defendants believed might have been helpful to their defense." (*People v. Hall* (1992), 235 Ill. App. 3d 418, 427, 601 N.E.2d 883.) Because there is no evidence that the police acted with a "sinister motive" or with "ill will" in returning the victim's underwear to her, we reject defendant's arguments.

We next address the issue of whether an *ex parte* communication between the judge and the jury, in combination with a subsequent *Prim* instruction from the court, constituted reversible error. In order to address this argument, it is necessary to examine the sequence of events which occurred during jury deliberations.

At approximately 2:25 p.m. on Tuesday, January 14, 1992, the jury retired to begin deliberations. While the deliberations were in progress, the parties were informed by the court that the jury had a question regarding the necessary elements of criminal sexual assault. The trial court responded in writing to the question following consultation with the attorneys.

Later that afternoon, the court called the attorneys into chambers and made the following statement:

> "Let me advise you of the sequence of events. I received a note from the jury through Deputy Sheriff Olsson. The note said we are hopelessly deadlocked, and they included some numbers. I was fearful that it included how many people were voting which way or the other way on the case. I didn't want to see the breakdown of the positions. I asked Deputy Olsson to give me a new note without the breakdown, and a new note came out once again concerning the instruction as to the element[s] of the offense, and I quote directly, 'Judge Singer, is proposition number 3 plain assault or sexual, question mark. Can we get a statement of the closing argument of the State's Attorney's last ten minutes.' "

When defense counsel inquired as to the whereabouts of the note from the jury stating that it was deadlocked, the court stated:

"I saw the top said we are hopelessly deadlocked. I saw the numbers on the bottom that appeared to be numbers of which way the vote was, the series of votes. I gave the note back to the deputy sheriff and said I cannot take the numbers. Please ask them to re-write the note without the numbers, and the deputy sheriff came out with the new two questions. Obviously, they deliberated further while I was waiting for everybody to come down and they came out with the new questions."

The cause was once again recessed during deliberations and, at 5:30 p.m., the trial court received a second note indicating again that the jury was hopelessly deadlocked. Following discussion with all parties present, the decision was made not to respond to the note. At approximately 6:15 p.m., a third note was received from the jury which again stated that it was deadlocked. At this point the State requested that the jury be given a *Prim* instruction urging consensus. (See *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The defense made a motion for a mistrial and the court decided to deny the mistrial motion and to give the *Prim* instruction.

Deliberations continued that evening. At approximately 8:25 p.m., the trial court made the decision to sequester the jury. The defense made another motion for a mistrial which was denied.

The next morning, Wednesday, January 15, 1992, the jury requested to see State exhibit No. 11, which was the police inventory of the complainant's clothing which had been returned to her. The judge instructed the jury, after consulting with the attorneys, that it could not see the item because this exhibit had not been admitted into evidence. Later that afternoon, approximately 24 hours after the jury had begun to deliberate, both the State and the defendant made a joint motion for mistrial. The motion was denied.

Thereafter, after a total of approximately 12 hours of deliberating, the jury returned a guilty verdict.

After the jury had been polled, defense counsel requested that it see the first note in which the jury indicated that it was deadlocked. The trial court refused the request, stating that the note was not properly part of the record.[2] Following post-trial motions, the court emphasized that it did not see the numbers on the first note. The court then denied defendant post-trial relief.

On appeal, the State concedes that the trial court committed er-

---

[2]The trial court apparently overlooked Supreme Court Rule 608(a)(8), which states that the record on appeal must contain "communications from the jury during deliberations." 134 Ill. 2d R. 608(a)(8).

ror in communicating with the jury outside the defendant's presence, but argues that the error was harmless.

"For many years, it was a strict rule that any *ex parte* communication whatsoever by the judge or a third person with the jury was plain error, despite that there was no improper motive or effect on the jury [citation], regardless of the correctness of the response or instruction to the jury, or whether actual prejudice was demonstrated [citations]." (*People v. Childs* (1994), 159 Ill. 2d 217, 227, 636 N.E.2d 534.) The modern and more flexible rule, however, is that a jury verdict need not be set aside where it is apparent that no injury or prejudice resulted from a communication to the jury either by the trial court or a third person outside the presence of the defendant and his counsel. (*Childs*, 159 Ill. 2d at 227-28.) The State has the burden to show that no prejudice occurred: "Because an *ex parte* communication between a judge and a jury deprives a defendant of his constitutional rights to be present at and to participate for his protection in a critical stage of trial, the burden is on the State to prove *beyond a reasonable doubt* that the error was harmless." (Emphasis added.) *Childs*, 159 Ill. 2d at 228.

■ The State has not met its heavy burden in this case. The jury members received instructions from the judge to rewrite their first note to him in which they disclosed to him how many jurors were for conviction and how many were against conviction. The record does not indicate what the breakdown of jurors was at this time,[3] but the jury was likely under the impression that the trial court had read its note and was aware of the numeric breakdown. We note that the trial judge never indicated to the jury that he had not read the first note. If the jury favored conviction at the time it sent the judge the note with the numerical breakdown, it is quite possible that a member or several members of the jury believed the *Prim* instruction was given because the judge also favored conviction. In such a situation, there is the real possibility that such a juror or jurors were improperly coerced into voting for conviction. (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984.) Because the State has failed to demonstrate beyond a reasonable doubt that the jury had not been so influenced, we find reversible error.

---

[3]The defendant has included in the record an affidavit from a member of the jury in which the jury member indicates the numeric breakdown of the jury at the time the first note was sent to the trial court. In light of the fact that this note was not made part of the defendant's post-trial motion, however, we do not view this affidavit as properly being part of the record. We therefore analyze the issue without regard to the information contained in the juror affidavit.

•

In light of disposition of this case, we need not address the remaining claims of error raised by the defendant, with one exception. We address this issue because we think it likely to recur on remand.

During the jury instruction conference the defendant tendered the following instruction to the court:

> "When one party has exclusive control over evidence that if produced would be enlightening on the issue and fails to do so, the trier of fact can make an inference that the evidence if produced would be unfavorable to that party."

This instruction is based upon Seventh Circuit Committee (1980) Instruction No. 3.25. (See *People v. Bergin* (1992), 227 Ill. App. 3d 32, 41, 590 N.E.2d 939.) The trial court refused the instruction. On appeal, the defendant argues that the instruction should have been given because the State was responsible for the destruction of the complainant's underwear.[4] For support the defendant relies upon *United States v. Mahone* (7th Cir. 1976), 537 F.2d 922.

In *Mahone* the Seventh Circuit Court of Appeals held that a "missing witness" instruction similar to the one tendered by the defendant in this case should be given when two conditions are met: (1) the missing witness was "peculiarly within the other party's power to produce"; and (2) the testimony of the witness would "elucidate issues in the case." (*Mahone*, 537 F.2d at 926-27.) Drawing an analogy between a missing witness and missing evidence, the defendant argues that his tendered instruction was necessary to inform the jury on how to treat the missing underwear issue.

The law with regard to nonpattern jury instructions is well settled. Whenever applicable, an Illinois Pattern Jury Instruction (IPI) should be used whenever it accurately states the law. A non-IPI instruction should be used only if the pattern instructions for criminal cases do not contain an accurate instruction and if the tendered non-IPI instruction is simple, brief, impartial, and free from argument. (134 Ill. 2d R. 451(a).) The decision of whether to give a non-IPI instruction is within the sound discretion of the trial court. (*People v. Bergin* (1992), 227 Ill. App. 3d 32, 41, 590 N.E.2d 939.) The court abuses its discretion in refusing to give an instruction when the jury is not instructed on a defense theory of the case which is supported

---

[4]The State argues that the defendant has waived this issue in that the instruction tendered to the trial court was not tendered in the context of a discussion about the missing underwear, but instead, about the absence of certain results from the rape test kit administered by the police serologist. We agree that the issue was waived in the trial court but address the issue in light of the fact that the issue is likely to be raised on remand.

by the evidence. *People v. Wolfe* (1983), 114 Ill. App. 3d 841, 852, 449 N.E.2d 980.

■ We do not believe the instruction tendered by the defendant was appropriate to the facts of this case for the simple reason that the complainant's underwear, at the time of trial, was not "peculiarly within the [State's] power to produce." This evidence had been destroyed 18 months earlier by the complainant and the tendered instruction has the potential to be confusing. We note, however, an instruction discussed by the Supreme Court in *Youngblood* which we believe is appropriate under these facts. The instruction states:

> "If you find that the State has ... allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." (See *Youngblood*, 488 U.S. at 59-60, 102 L. Ed. 2d at 290, 109 S. Ct. at 338 (Stevens, J., concurring).)

We believe such an instruction, when combined with the defendant's opportunity to argue the "missing evidence" issue to the jury in closing, serves as an effective protection to defendants from any uncertainty that might arise from missing evidence. The instruction also serves as an incentive for the police to exercise due care in their handling of evidence. This instruction is particularly important in those cases, as here, where the police have in their possession evidence and subsequently fail to properly preserve the evidence for trial. We therefore hold that the defendant is entitled to receive this instruction on remand, should his counsel tender it.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for further proceedings.

Reversed and remanded.

RAKOWSKI, J., concurs.

JUSTICE EGAN, specially concurring:

I concur in the judgment remanding this case for a new trial on the ground that the judge participated in an *ex parte* communication with the jury; and I agree that no violation of the defendant's due process rights occurred by the destruction of evidence. But I disagree with a number of things that are said in the majority opinion.

*People v. Ward* is not the last word by the supreme court on the effect of the loss or destruction of evidence on a defendant's right to due process. In a later case, *People v. Hobley* (1994), 159 Ill. 2d 272, 637 N.E.2d 992, the defendant alleged that he had not been given the

results of tests on fingerprints taken from a gasoline can. Rather than consider the claim as a *Brady* violation, the supreme court analyzed the case as one "where evidence has been lost or destroyed and its contents are unknown." (159 Ill. 2d at 307.) The court said that the case was analogous to *Youngblood* and concluded as follows:

"In order to promote the preservation of exculpatory evidence, there must be the possibility of a sanction where evidence is lost or destroyed. On the other hand, a defendant should not be rewarded for the inadvertent loss of a piece of evidence where other evidence sufficient to support his conviction remains. The proper balance between these competing interests can be accomplished through careful consideration of (1) the degree of negligence or bad faith by the State in losing the evidence, *and* (2) the importance of the lost evidence relative to the evidence presented against the defendant at trial." (Emphasis added.) 159 Ill. 2d at 307.

The court concluded that no due process violation had occurred because of the absence of proof of bad faith and "[m]ore importantly, there was independent evidence tying defendant to the gasoline can." (159 Ill. 2d at 308.) The court also relied on the fact that there was overwhelming evidence of the defendant's guilt separate from the gasoline can.

In the very recent case of *People v. Newberry* (1995), 166 Ill. 2d 310, the supreme court upheld dismissal of an indictment for destruction of evidence even in the absence of bad faith on the part of the custodial police. It seems clear to me, therefore, that, under Illinois Supreme Court precedent, the inquiry into whether a due process violation has occurred does not end with the determination of whether the evidence was lost or destroyed through bad faith.

The language of the supreme court in *Hobley* is consistent with the cases from other jurisdictions cited by the majority which have refused to follow *Youngblood* but have held that the negligence or bad faith of the police is one factor which may be considered. For example, in *Commonwealth v. Henderson*, the Supreme Court of Massachusetts held that whether an indictment should be dismissed for police failure to preserve potentially exculpatory evidence was within the trial judge's discretion. In the exercise of that discretion the "judge must consider and balance the degree of culpability of the government, the materiality of the evidence, and the potential prejudice to the defendant." (*Henderson*, 411 Mass. at 310, 582 N.E.2d at 496.) In *State v. DeLisle*, the Supreme Court of Vermont said that the court should consider the degree of negligence or bad faith on the part of the prosecution; the importance of the evidence lost; and the

other evidence of guilt at trial. The other cases mentioned by the majority are in the same vein.

The posture of this case is unlike any of the cases cited from other jurisdictions, or *Ward*, *Hobley* or *Newberry*, in that the question was never raised in the trial court. The defendant knew eight months before trial that the evidence was no longer available. He made no motion to dismiss, which is the only relief sought by the defendant in this court; and he never moved to strike the testimony of the complainant. Neither Derrick Webster, the man who recovered the complainant's clothes from a trash can, nor Officer Bradshaw, who received the clothes and inventoried them, was ever asked any questions about the condition of the clothes. Consequently, the State was never given an opportunity to present any evidence to explain any mitigating circumstances for the release of the clothes or any possible evidence corroborating the complainant's testimony that the clothes were torn. Most important, the trial judge was never given an opportunity to exercise his discretion. The defendant did not even raise the question in the post-trial motion. Under the circumstances, it would be manifestly unfair to hold that the trial judge had permitted a violation of the defendant's due process rights. I conclude that, if the judge had been called to exercise his discretion and if he had concluded that the indictment should not be dismissed, which is what the defendant urges now, I would hold under the totality of the evidence that the judge had not abused his discretion.

I do not agree with the majority that the affidavits of the jurors showing that the jurors were deadlocked eight for conviction and four for acquittal are not properly before us. The affidavits of the jurors are file-stamped February 11, 1992, the same day that the defendant filed his motion for a new trial. His motion for a new trial specifically states that "[i]t is unequivocally clear that members of the jury in this cause were aware that both the numerical division of the jury, *as well as how they stood on the issue of guilt*, was conveyed to the Trial Judge." (Emphasis added.) Moreover, I note that the defendant's brief and reply brief both refer to the affidavits and that the State does not take issue with the defendant's referring to them. The fact that a two-to-one majority for conviction existed is probative when considering the effect of the judge's subsequent communication to the jury. See *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984.

I agree that some instruction on missing evidence *may* be justified when evidence is lost and destroyed; but I am not prepared to say that the specific instruction mentioned by the majority is necessarily the one that should be given or that a similar instruction must

always be given. There may be instances where the evidence is lost or destroyed after the passage of time during which the evidence was available for examination, but the defendant did not examine it, or there may be instances where the evidence was examined by the defendant. In such cases, I question whether an instruction is proper. But if an instruction is given in those cases, the instruction should point out that the evidence was available for examination by the defendant or that the defendant did examine the evidence. I note parenthetically that the defendant's attorney argued very effectively to the jury about the missing undergarments.

I would also address the defendant's claim that the judge erred in not giving *sua sponte* two non-IPI instructions, one on intent and one on the lesser included offense of aggravated battery. In my judgment, the judge did not err by not submitting these instructions *sua sponte*.