2025 IL App (1st) 232362-U

FIRST DISTRICT,
SIXTH DIVISION
April 25, 2025

No. 1-23-2362

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CR 0164101 |
| | ) | |
| JOHN BRESEMAN, | ) | Honorable |
| | ) | Joseph M. Cataldo, |
| Defendant-Appellant, | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not abuse its discretion by refusing to give defendant's proposed non-pattern jury instruction and denying his motion to bar the testimony of two witnesses, and any perceived error was harmless.

¶ 2    Following a shooting in the early hours of January 1, 2021, defendant John Breseman was charged with and convicted by jury of first degree murder of Christina Czuj (720 ILCS 5/9-1(a)(1), (2) (West 2020)). The circuit court sentenced Breseman to a total of 58 years' imprisonment. On appeal, Breseman contends the circuit court erred in (1) refusing to give his proposed non-Illinois

Pattern Jury Instruction (non-IPI jury instruction) and (2) denying his motion *in limine* to bar the State from presenting the testimony of two witnesses. We affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4        The undisputed evidence shows that after leaving a bar the night of December 31, 2020, Breseman and Christina Czuj were driving down the highway and got into an altercation. Breseman pulled out his gun and shot and killed Czuj. Breseman does not dispute killing Czuj, but asserts he killed her in self-defense. Several witnesses testified in the State's case and Breseman testified in his own defense. We recite only the facts relevant to our decision herein, noting that the record is replete with testimony from Breseman himself about the volatility of his relationship with Czuj, an admission by Breseman that Czuj called him her "stalker," the fact Breseman used *67 to call her incessantly after Czuj blocked his number, and the fact she called police just three months before her death because Breseman was "calling too much." From that point on, Breseman had to hide when he went over to Czuj's residence and usually met her at Jewel or Panera, just as he did the night she was killed.

¶ 5        According to Breseman, Czuj began calling him her "stalker" about four months before the shooting, after Breseman passed by her house and called her to say, "I'm right behind you." Czuj later told the owner of a bar, "[Breseman] loves me and this is my stalker and he wants to marry me and everything else."

¶ 6        On December 31, 2020, the night of the shooting, Breseman met Czuj at the Panera in Carpentersville. Breseman arrived first and went through the drive through to buy three caffè mochas—one for each of them and one for Czuj to save for later. Czuj arrived, and they drove toward Deer Park together. Breseman had a FOID card and a conceal carry license. He carried his pistol in a holster on his ankle and a magazine in his pocket. They went shopping and had dinner, where Czuj drank half a bottle of wine and a Bailey's. Breseman had three beers. Later in the

evening, they stopped by Bullseye Pub in Algonquin to play darts, drink, and dance. On cross-examination, Breseman admitted he took Czuj's phone when she was not looking and went through it in the bathroom. He put it back in her purse when he returned from the bathroom, took it out again, and put it back. Breseman planned to leave Bullseye Pub around 9:30 p.m. but a patron bought Czuj a shot, so they ended up staying until a little after 11:00 p.m.

¶ 7     According to Breseman, Czuj "passed out right away" when they got into his truck. Breseman drove to Panera to pick up Czuj's car, but she could not stay awake, so he offered to drive her home. Czuj said, "[N]o, no, no" and passed out again. Breseman decided to "drive around" with her in the vehicle. Breseman said he "could have" taken her home because she "didn't need to be driving a vehicle." Instead, he drove them to O'Hare Airport and back. Czuj was still sleeping so Breseman repeated much of the same route. While driving, Breseman decided to play a "little game" with Czuj and began calling her phone, even though she was sitting right next to him. Czuj answered, and Breseman asked if she "wanted to watch the fireworks." She said "no" and hung up. Minutes later Breseman called her back and said, "hey, I love you."

¶ 8     A historical cell site analysis for Breseman's cell phone reveals that at 12:11 a.m. on January 1, 2021, Breseman made a 42-second call to Czuj's cell phone. He called her again at 12:15 a.m. for 26 seconds. Both times, Breseman utilized *67 to block his phone number from showing up on caller ID.

¶ 9     While Breseman was driving around, Czuj woke up and said she had to go to the bathroom. She passed out again while Breseman was driving west on I-90, and he decided to go back to Panera to get her car. Czuj woke up again and asked why she was not home, and Breseman told her, "because you've been drinking." According to Breseman, Czuj repeated her desire to use the restroom, "jumped up on the center console and pulled her pants down," and urinated "all over the center console" and herself. She slid back into her seat and "just lost it."

¶ 10    Breseman testified that Czuj tried to open her door and said she wanted to die. He grabbed her arm as he was driving down the highway to keep her in the truck. According to Breseman, Czuj then "turned on him." She began "throwing things and hitting [him] over the back of the head and grabbing the steering wheel." Breseman testified Czuj said "die, die," but he did not understand what she was saying and did not respond. Breseman was hit with "liquid and objects" but was unsure what it was because he turned his head to the side.

¶ 11    Breseman testified that while this was occurring, he "evidently" grabbed his gun from the center console and fired. He did not remember shooting, and "wasn't even looking" when he fired the gun, looking forward instead. He did not "have a plan" and did not "think about" grabbing the gun and pulling the trigger. He did not pull over the truck because he "didn't have time to think" and "just reacted." When defense counsel asked why he did not "just backhand her," Breseman said he had never hit a woman before. Instead, Breseman grabbed for his gun and continued driving down the highway at 65 m.p.h. throughout the incident. After shooting Czuj, Breseman asked her if she was "all right." She did not respond. Breseman was in shock and thought about killing himself.

¶ 12    On January 1, 2021, at 1:06 a.m., Breseman called his son Jonathan and said, "I shot and killed Christina." He told Jonathan he was going to kill himself. Jonathan told him not to and asked him to call a friend, Debra Rykoff. Rykoff testified Breseman called her around 1:10 a.m. and said, "I've killed Christina." Rykoff told Breseman to call 911 and drive Czuj to the emergency room. During their conversation, Breseman told her that he was arguing with Czuj and she hit him over the head, tried to get out of the moving truck, and was "acting very erratically" and "urinating everywhere." Breseman told Rykoff he did not mean to shoot Czuj.

¶ 13    At 1:13 a.m., Breseman called 911 and told the operator, "I shot and killed my passenger." The operator told Breseman to stop driving, so Breseman pulled over. Breseman removed the

bullets from the gun "to make it safe for when the police officers arrived." Later, Breseman noticed he had a chipped tooth and a cut over his eye. Breseman testified he did not remember if he told police Czuj hit him in the head. During his transport from the scene, Breseman told the officer: "[T]hat's what alcohol does."

¶ 14    On cross-examination, Breseman testified his relationship with Czuj was sometimes "volatile" and they fought occasionally. Czuj did not introduce him to her friends and hid his identity from her family. A few days before the shooting on December 28, 2020, Breseman and Czuj exchanged emails. Breseman sent Czuj an email saying, "Thought you said you don't go out on New Year's Eve but now possibly going out with Huber. Really? Remember I wanted to do something with you." Breseman also emailed Czuj about her late husband, saying, "I know why Frank's phone was sitting on the countertop because you reactivated it. Thought you didn't have anything to hide. Was wondering why the bill was more expensive." Czuj responded, "Now it's the end, Psycho. His account has been deactivated since a while after he passed….but thanks for calling me a liar again. You really know how to treat someone. *** I really don't have time for your senseless time consuming exhausting shit." Breseman emailed Czuj stating, "Maybe I'm just a jealous fool that loves you very much that wants nothing more than us to share our life together." Breseman acknowledged Czuj accused him of being "delusionally jealous." After some cajoling, Czuj agreed to spend time with him on the fateful night of New Year's Eve.

¶ 15    Forensic extraction data from Breseman's phone showed Breseman called Czuj's cell phone 216 times from December 27, 2020, through January 1, 2021 (an average of 43 times a day), utilizing the *67 feature each time. Breseman did not use the feature for calls to any other number. Czuj called Breseman 20 times in the same period. Breseman's credit card statement shows a recurring monthly charge of $26.95 to SeekHD, which is a way to search by name for people or email without their knowledge.

¶ 16    In its case in chief, the State called Margaret Loose to testify. Loose testified she was bartending at Bullseye Pub the night of December 31, 2020. At some point that night, Loose stepped out from behind the bar to speak with Czuj. Czuj whispered in her ear, "that's not my boyfriend, that's my stalker." Breseman was sitting next to Czuj and leaned in to learn what they were talking about. Loose noticed Breseman and Czuj were not interacting very much throughout the night. She said Breseman appeared "very reserved, but he was definitely watching [Czuj]."

¶ 17    Amanda Hinojosa was a patron at Bullseye Pub that night. At one point, Hinojosa saw Czuj frowning and invited her over for a shot. Hinojosa hugged Czuj and told her, "we're going to have a great 2021." Czuj responded, "I will have a good 2021 as long as I don't have to be with [Breseman]." Hinojosa said Czuj appeared intoxicated, and Breseman was watching Czuj from a distance. Czuj told her Breseman was "her stalker" but did not elaborate further. Hinojosa took it as a "flippant remark" indicative of a "relationship gone sour."

¶ 18    Prior to trial, Breseman filed a motion *in limine* to prevent Loose and Hinojosa from testifying that Czuj told them Breseman was her "stalker." The circuit court found these statements were "not offered for the truth of the matter asserted but to show the nature of the relationship, and the defendant's motive shows there was animosity and conflict that apparently was escalating between the two." The court denied Breseman's motion *in limine*, stating: "The statements I find are probative to show the conflicting and overall antagonistic relationship between the victim and the defendant which can establish motive and intent to kill, making the evidence more probative than prejudicial." Breseman challenges this ruling on appeal.

¶ 19    Breseman also challenges the court's refusal to give his proposed non-IPI jury instruction in response to evidence proffered by the State through witnesses, like Barrington Hills Police Officer Austin Thomas, who testified that Czuj had a substance that looked like blood on her face.

¶ 20    Thomas testified he observed Breseman's silver Chevrolet Silverado on the shoulder of

Palatine Road on January 1, 2021, around 1:17 a.m. As he passed by the truck, Thomas received a dispatch call of "shots fired" and a gun in the center console of the truck. Inverness Police Officer Akin was already at the truck when Thomas arrived. Breseman exited the truck at Akin's instruction and Thomas placed him in custody. Thomas looked inside the truck and saw Czuj in the passenger's seat.

¶ 21     At trial, Thomas was shown photographs of Czuj in the truck. When asked to describe them, he testified: "[Czuj has] a gunshot just below her collar bone here. And it looks like blood dripping down, and it looks like blood on her face." On cross-examination, Thomas admitted he had no idea if it was blood and that the stain on her face could be brown, not red.

¶ 22     Palatine Police Sergeant Andrew Olech was also shown a photograph of Czuj in the truck. He recognized a brown stain around the area of her nose and on the right side of her face. There were also brown stains inside the truck. No swabs were taken from Czuj's cheek. Olech did not observe any bruises on Breseman's knuckles.

¶ 23     Leslee Nissen, a crime scene investigator with Illinois State Police (ISP), was asked on direct to describe what he saw in the State's exhibit 40. He pointed to "red blood like staining around [Czuj's] facial features." On cross-examination, defense counsel asked Nissen: "Doesn't appear to be blood, does it?" Nissen replied: "This is characteristic of drying red blood like staining on the facial features in the way it's dried is [sic] leans more toward red blood like staining than it would a liquid."

¶ 24     ISP Trooper Matthew Myers similarly observed an unidentified liquid splattered throughout the interior, "blood like stains" on the seat, and a "coffee-like drink" on the floor. Myers swabbed the steering wheel, gear shifter, driver-side door handle, armrest, and the blood like stain on the front passenger seat. He did not swab Czuj's face and explained: "We don't swab every liquid in a car." Myers further testified that three shots were fired. Two projectiles were recovered

from Czuj during the autopsy: one in the left side of her head and one in her jacket on the left side of her chest. A third was found in the door. All three recovered casings were fired by the same gun, and all three recovered bullets were fired from Breseman's gun.

¶ 25    ISP Special Agent Michael Cokins was also shown a photograph that depicted brown stains on Czuj's face and neck. Cokins did not swab the stain because "[i]t appeared to be a blood stain" based on the "evident blood at the scene" and "bullet hole in her chest." Cokins could not tell whether the brown stain was blood and did not direct Myers to collect a swab of the stain because "[a]t the moment, there was no significance in collecting a swab of the cheek."

¶ 26    Breseman argues on appeal that because the police did not swab and test the substance on Czuj's face, he was entitled to a non-IPI jury instruction informing the jury they could make an inference against the State.

¶ 27    Following closing arguments, the jury convicted Breseman of first degree murder and personally discharging a firearm that proximately caused death. The court sentenced Breseman to a total of 58 years' imprisonment, including a 25-year mandatory firearm enhancement. Breseman appeals.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, Breseman argues (1) the circuit court erred in refusing to give his proposed non-IPI jury instruction regarding the destruction of "potentially exculpatory biological evidence" and (2) denying his motion *in limine* to bar the State from presenting the testimony of Loose and Hinojosa that Czuj described Breseman as her "stalker" the night of her death.

¶ 30                                 A. Jury Instruction

¶ 31    Breseman argues the circuit court abused its discretion in refusing to give his proposed non-IPI jury instruction regarding the destruction of "potentially exculpatory biological evidence." Breseman contends the police's failure to swab and test the substance on Czuj's face violated the

legal obligation under 725 ILCS 5/116-4(a) to "preserve biological material in homicide cases." As such, he was entitled to the following non-IPI jury instruction: "If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." This is the same instruction used in *People v. Danielly*, 274 Ill. App. 3d 358, 360 (1995) and discussed in Justice Stevens' concurring opinion in *Arizona v. Youngblood*, 488 U.S. 51, 60 (1988) (Stevens, J. concurring).

¶ 32        The circuit court denied the instruction, stating: "[A] police officer, crime scene investigator, an investigator, and a medical examiner all did not find some faint brown stain on the victim to be of any significance, and I still don't see anything that has been presented to show that it should have." The court continued: "If swabs were taken, as argued, [they] may have shown not blood but wouldn't have shown what it was. The State did not use any possible brown stain as any evidence against the defendant here." Ultimately, the court found:

> "[T]he instruction would do nothing but possibly mislead the jury. The Defense is free to argue that she had brown stains that appear to be the caffè mocha and don't appear to be blood and everything you just said, but I don't find an instruction is appropriate under these facts and circumstances, so I'm not going to give the instruction."

¶ 33        The purpose of jury instructions is to "provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "A non-IPI instruction should be used only if the pattern instructions for criminal cases do not contain an accurate instruction and if the tendered non-IPI instruction is simple, brief, impartial, and free from argument." *Danielly*, 274 Ill. App. 3d at 367. "The decision of whether to give a non-IPI instruction is within the sound discretion of the trial court." *Id.* "The court abuses its discretion in refusing to give an instruction when the jury is not instructed on a defense theory of the case which is supported by

the evidence." *Id.* at 367-68. We find no abuse of discretion.

¶ 34    Breseman claims that because the State's witnesses said the substance on Czuj's face looked like blood, this "allowed the jury to falsely conclude that [he] must have physically struck the decedent." Although Officer Thomas testified the substance on Czuj's face "looks like blood," he later acknowledged on cross-examination that the staining on her chin and neck was brown, not red. He never suggested the stain was from Breseman hitting or attacking Czuj. Nor did anyone else. In fact, Sergeant Olech testified he did not see any bruises on Breseman's knuckles and Breseman said he never hit Czuj.

¶ 35    Investigator Nissen testified there was brown liquid throughout the truck. When pressed by defense counsel about his description of "red blood like staining around [Czuj's] facial features," Nissen replied: "This is characteristic of drying red blood like staining on the facial features in the way it's dried is [*sic*] leans more toward red blood like staining than it would a liquid." While Breseman argues this testimony was unduly prejudicial, it was elicited by his defense counsel, not the State. Nonetheless, it is inconsequential to Breseman's defense based on the overwhelming evidence that there was caffè mocha everywhere, just as Breseman described.

¶ 36    Trooper Myers testified there was an empty coffee cup in the console and a "coffee-like drink" on the floor of the truck. Photographs showed a brown liquid on the passenger's side floor and driver's side window. Trooper Hasanbegovic observed brown stains on Breseman's sweatshirt. Above all, the State argued in closing:

> "[T]here's caffè mocha all over the car, and that was not swabbed. Why would they need to? Why would they need to swab Christina's body for caffè mocha or the car for caffè mocha? There is a coffee cup on the front passenger floorboard and a light brown liquid all around those plastic floor mats that retain that liquid. Common sense tells you this is caffè mocha. Why would they swab that? Why would they swab her cheek for caffè mocha?"

This concession by the State that the stain on Czuj's face was caffè mocha, not blood, makes the nature of the stains on Czuj's face a non-issue and diminishes the need for a non-IPI jury instruction, which is conditioned on the content or quality of the evidence being "in issue."

¶ 37    The analysis in *People v. Montgomery*, 2018 IL App (2d) 160541, is instructive. In *Montgomery*, the defendant was charged with driving under the influence, but the police officer's video recording of the traffic stop was not available for trial. *Id.* ¶ 3. The defendant argued the trial court erred when it declined to give the same non-IPI instruction suggested here. The Appellate Court disagreed, finding that, because "there was nothing to suggest that the video would have shown anything contrary to [the officer]'s testimony, the requested instruction was not in accordance with a defense theory of the case that was supported by the evidence." *Id.* ¶ 21. Similarly, whether the stain on Czuj's face was blood or caffè mocha, it would not have shown something different than the circumstances Breseman described in his testimony, supported by other evidence, and acknowledged by the State.

¶ 38    Contrary to Breseman's contention, the circumstances justifying the non-IPI jury instruction in *Danielly* are not present in this case. In *Danielly*, the victim testified her underwear was torn and the defendant testified that it was not torn. *Danielly*, 274 Ill. App. 3d at 362-64. The State argued at trial the torn underwear was evidence of the defendant's guilt, so the condition of the underwear was therefore relevant to prove the sex was not consensual. *Danielly*, 274 Ill. App. 3d at 363-64. The defendant asserted the underwear would have been physical evidence contradicting the victim's claim it had been torn and supporting his claim that the sex was consensual. *Id.* at 363. We held that on remand, the non-IPI jury instruction would be appropriate, as it would serve as an "effective protection to defendants from any uncertainty that might arise from missing evidence" and as an "incentive for the police to exercise due care in their handling of evidence." *Id.* at 368.

¶ 39 In contrast, swabbing Czuj's face for blood would not have been physical evidence supporting his claim of self-defense. If it tested negative for blood, it would not have tested positive for caffè mocha. Moreover, the State did not contest the substance on Czuj's face, so it was not at issue, unlike *Danielly*. What's more, there is no evidence of bad faith on the part of the police in not swabbing Czuj's face, for they have no duty to retain and preserve "all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. Unless Breseman "can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

¶ 40 As expressed by Justice Stevens, "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair. This, however, is not such a case." *Id.* at 61 (Stevens, J. concurring). Nor is Breseman's, given the unlikelihood that the evidence would have provided him an advantage, especially since the State conceded in closing argument that the substance on Czuj's face was caffè mocha, not blood. This is the precise negative inference Breseman advocated for with the non-IPI jury instruction. As such, any perceived error in not giving the non-IPI jury instruction was harmless error, at best.

¶ 41                                  B. Motion *in Limine*

¶ 42 Next, Breseman argues the circuit court abused its discretion in denying his motion *in limine* to bar Loose and Hinojosa from testifying Czuj told them Breseman was her "stalker" the night of her death. He contends the probative value of their testimony was "substantially outweighed by the danger of unfair prejudice and confusion of the issues by misleading the jury with respect to who the aggressor was." We disagree.

¶ 43 A motion *in limine* is addressed to the trial court's inherent authority to admit or exclude evidence, and the court's evidentiary ruling is reviewed for an abuse of discretion. *People v. King*,

2020 IL 123926, ¶ 35; *People v. O'Daniell*, 2024 IL App (5th) 230084, ¶ 45. An abuse of discretion occurs only where the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 44    Generally, evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see also Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). "The plain language of Rule 403 favors admission of relevant evidence" so the jury is "placed in its proper position of considering relevant evidence and assigning it the appropriate weight." *People v. Epstein*, 2022 IL 127824, ¶ 22.

¶ 45    In this case, the testimony of Loose and Hinojosa is unquestionably relevant, as they presented a candid view into the nature of Czuj and Breseman's relationship and helped explain a motive for Breseman shooting and killing Czuj. Loose and Hinojosa not only heard Czuj call Breseman her stalker but observed Breseman throughout the night at Bullseye Pub. Loose noticed he was "very reserved, but *** definitely watching [Czuj]." Hinojosa also noticed Breseman was watching Czuj from a distance when Czuj approached her table to take a shot. Breseman himself corroborated Czuj's description of him as her "stalker." He explained how he was told to stop calling Czuj and resorted to sneaking around to see her during the months leading up to her death.

¶ 46    Despite its undeniable relevance, Breseman contends the testimony of Loose and Hinojosa is unfairly prejudicial and should have been excluded. Breseman argues it "permitted the jury to conclude that, because the Defendant was a 'stalker,' which class of persons, by definition, aggressively pursue their intended targets, the Defendant was the aggressor and, ergo, could not

qualify for the affirmative defense of self-defense."

¶ 47    Evidence is unduly prejudicial only if it "cast[s] a negative light upon the defendant *for reasons that have nothing to do with the case on trial*" [citation], or invites the jury to decide the case 'on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror' [citation]." (Emphases in original.) *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 30. "Generally, evidence which shows that the accused had a motive to kill the victim is relevant in a homicide case if the evidence establishes the existence of the motive relied upon or alleged." *People v. Robinson,* 189 Ill. App. 3d 323, 343 (1989); see also *People v. Buschauer*, 2022 IL App (1st) 192472, ¶ 77 ("motive supplies a well-established, nonhearsay purpose to admit out-of-court statements that would otherwise be hearsay").

¶ 48    Here, the evidence has at least something, not "nothing to do with the case on trial." *Romanowski*, 2016 IL App (1st) 142360, ¶ 30. It illustrates the nature of Breseman's relationship with Czuj and shows a motive to kill. The evidence was also presented in context of other relevant evidence and Loose's and Hinojosa's observations of Breseman at Bullseye Pub.

¶ 49    Lest we forget, Breseman himself testified about an incident four months before the shooting where Czuj accused him of being a stalker and later told someone Breseman "loves me and this is my stalker and he wants to marry me and everything else." Breseman called Czuj 216 times in the five days leading up to the shooting, hiding his number each time with *67, and weirdly calling her twice as she sat next to him in the vehicle. Three days before the shooting, Czuj called Breseman "Psycho" in an email to which Breseman responded: "Maybe I'm just a jealous fool." All this evidence, including Czuj's statements to Loose and Hinojosa referring to Breseman as her "stalker," was relevant to prove the nature of their volatile relationship and Breseman's motive for shooting and killing her. It was not unduly prejudicial or improperly admitted. See *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 139 (court properly admitted statements from murder

victim's friends that she told them the defendant "wanted a divorce because he believed she and the boys were holding him back from realizing his full potential, but he did not want to jeopardize his job by filing for divorce" for purposes of proving motive).

¶ 50 Breseman's reliance on *Romanowski*, 2016 IL App (1st) 142360, is misplaced. In *Romanowski*, the defendant claimed the admission of the arresting officer's testimony concerning the contents of the warning to motorists in a trial for driving under the influence was unduly prejudicial because it "undermines the presumption of innocence." *Id.* ¶¶ 29-30. We rejected this argument, noting evidence of guilt "*always* undermines the presumption of innocence" (emphasis in original), and found: "While the warnings may be circumstantial evidence of defendant's guilt, this does not encourage a decision on any improper basis." *Id.* ¶ 30.

¶ 51 Likewise, even if the testimony of Loose and Hinojosa cast Breseman in a negative light, it was not unduly prejudicial. Nor did it encourage a decision on any improper basis given the overwhelming other evidence showing the tumultuous nature of Breseman and Czuj's relationship, witnesses' observations, and video, as well as the wholly unreasonable and excessive conduct of Breseman in firing three shots and shooting Czuj twice in response to her behavior. As discussed at oral argument, there were a myriad of lesser steps Breseman could have taken to protect himself without resorting to gunfire against Czuj, who was armed with nothing more than a cold caffè mocha and a water bottle. Even without Loose's and Hinojosa's testimony, it is easy to see why a jury would reject Breseman's self-defense claim given his unjustified use of disproportionate force under the circumstances.

¶ 52 III. CONCLUSION

¶ 53 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 54 Affirmed.